UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| GARY BUZZARD,<br><br>Plaintiff,<br><br>v.<br><br>DAKOTA, MINNESOTA & EASTERN RAILROAD CORPORATION,<br><br>Defendant. | Civil No. 08-5832 (JRT/AJB)<br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Paul W. Iversen, **WILLIAMS & IVERSEN, P.A.**, 1611 West County Road B, Suite 208, St. Paul, MN 55113, for plaintiff.

Brian J. Donahoe, **CUTLER & DONAHOE, LLP**, 100 North Phillips Avenue, Ninth Floor, Sioux Falls, SD 57104, for defendant.

Plaintiff Gary Buzzard is a former employee of Dakota, Minnesota, and Eastern Railroad Corporation ("DM&E"). Buzzard suffers from chronic alcoholism. During his employment at DM&E, Buzzard suffered a relapse and, in accordance with the DM&E Drug & Alcohol Policy, the company referred Buzzard to New Directions, its Employee Assistance Program ("EAP") provider. Buzzard then voluntarily signed an EAP Agreement and entered into a separate return-to-work agreement with DM&E. The return-to-work agreement described a treatment plan that Buzzard was obligated to follow in order to continue his employment with DM&E. DM&E subsequently terminated Buzzard after he failed to meet with his counselor. Buzzard alleges that DM&E violated the Americans With Disabilities Act ("ADA") and the Minnesota

Human Rights Act by terminating him. DM&E filed a motion for summary judgment, arguing that there is no genuine issue of material fact that Buzzard is not disabled under the ADA and that DM&E did not terminate Buzzard because of his alcoholism, but because he violated his return-to-work agreement. For the reasons stated below, the Court grants DM&E's motion.

## BACKGROUND[1]

At all relevant times, Buzzard was a resident of Owatonna in Steele County, Minnesota. (Compl. ¶ 1, Docket No. 1.) Buzzard was diagnosed with alcoholism and started treatment in either 1986 or 1987. (Buzzard Dep. Tr. at 12, 26, Iverson Aff. Ex. A, Docket No. 22.) Since then, he has been diagnosed several times with chronic alcoholism, and he has been treated numerous times for alcoholism. (Interrog. Ans. Nos. 4, 12, Donahoe Aff. Ex. 1, Docket No. 16.) He has attended Alcoholics Anonymous ("AA") meetings to support his sobriety. (Buzzard Dep. Tr. at 43, Iverson Aff. Ex. A, Docket No. 22.) Buzzard's longest period of sobriety since his initial diagnosis has been "close to six years." (*Id*. at 26.) During such periods, he has no impairment of major life activities. (Buzzard Dep. Tr. at 121, Donahoe Aff. Ex. 11, Docket No. 25.) Buzzard testified at his deposition that relapses of alcoholism impair his major life activities because he does not "eat as well" during those periods, eating "frozen food [and] chips," as opposed to the "full meals, vegetables, meat [and] potatoes" he eats when he is sober. (Buzzard Dep. Tr. at 153, Iverson Aff. Ex. A, Docket No. 22.) He also

---

[1] The Court views the facts and evidence in the record in the light most favorable to the plaintiff, the non-moving party. *Riley v. Lance*, 518 F.3d 996, 999 (8th Cir. 2008).

testified that his hygiene suffers during his relapses because he showers and shaves less often.  (*Id*. at 153-54.)  Buzzard testified that he "does not participate as well in . . . family . . . activities" during these relapses.  (*Id*. at 154.)

Buzzard had a friend in his sobriety program who recommended him to Roy Srp at DM&E, which operates in Minnesota.  (Buzzard Dep. Tr. at 45, Iverson Aff. Ex. A, Docket No. 22; Ans. ¶ 3, Docket No. 2.)  Srp interviewed Buzzard for a job, and during the interview Buzzard discussed his alcoholism, but did not say that he might need to take time off from work for treatment.  (Buzzard Dep. Tr. at 44-46, Iverson Aff. Ex. A, Docket No. 22.)  During the interview process, Buzzard also told the head of the mechanical department about his alcoholism.  (*Id*. at 42.)  DM&E offered Buzzard a job contingent on a physical.  (*Id*. at 44.)  During that physical, Buzzard again disclosed that he was a recovering alcoholic.  (*Id*. at 54.)

On March 20, 2006, DM&E hired Buzzard as a mechanic in DM&E's twenty-four month apprentice training program.  (Lund Aff. ¶ 2, Docket No. 18.)  When Buzzard was hired, he received a copy of the DM&E Drug and Alcohol Policy (the "Policy").  (Buzzard Dep. Tr. at 58, Donahoe Aff. Ex. 11, Docket No. 25.)  The Policy describes a "Voluntary Referral Policy," which encourages employees "who are experiencing [] alcohol or other drug use problems/disorders" to contact New Directions, the Employee Assistance Program ("EAP") for DM&E employees.  (Company Drug & Alcohol Policy at 3, Donahoe Aff. Ex. 3, Docket No. 16.)  The Policy states that DM&E will grant an employee an unpaid leave of absence for up to forty-five days after a referral to "complete primary treatment and establish control over the employee's alcohol or drug

problem." (*Id*. at 3-4.) If the employee elects this option, the employee may resume his or her service upon a counselor's recommendation. (*Id*. at 4.)

In November 2006, after a long period of sobriety, Buzzard relapsed. (Buzzard Dep. Tr. at 61, Donahoe Aff. Ex. 11, Docket No. 25.) In December 2006, Buzzard's wife contacted Traci Lund, Director of Human Resources at DM&E, to tell her that he was in an Owatonna hospital for an alcohol overdose. (Lund Aff. ¶ 4, Docket No. 18.) Lund immediately initiated a referral to DM&E's EAP program with New Directions. (*Id*.) Buzzard understood at the time that he had an alcohol problem and that DM&E was following its normal protocol by referring him to the EAP. (Buzzard Dep. Tr. at 72-73, Donahoe Aff. Ex. 11, Docket No. 25.) Buzzard did not object to participating in the EAP. (*Id*. at 72.) He and Lund signed a "New Directions Employee Assistance Program Management Referral Form" (the "Referral Form"). (Lund Aff. Ex. C, Docket No. 18.)

After Buzzard left the Owatonna hospital, Amanda Urness, an employee of the Steele County Department of Human Services, initiated a civil commitment proceeding against him. (Buzzard Dep. Tr. at 70-71, 88, Donahoe Aff. Ex. 11, Docket No. 25.) One of the terms of the stay of the proceeding required Buzzard to participate in inpatient treatment at a treatment facility called Family Focus. (*Id*. at 71.) Buzzard testified that he did not recall telling anyone at DM&E about the civil commitment proceeding or the terms of the stay. (*Id*.)

On December 29, 2006, Lund referred Buzzard to New Directions. The Referral Form signed by both Buzzard and Lund states that Buzzard had missed work for alcohol poisoning and that the goal was for Buzzard to "[s]uccessfully complete Substance Abuse

Professional's recommendation prior to return to work."  (Referral Form, Lund Aff. Ex. C, Docket No. 18.)  It further states that New Directions would communicate with Lund about whether Buzzard has kept "his [] initial appointments."  (*Id*.)

When Lund referred Buzzard to New Directions, he spoke with Roger Dunn, who is an EAP care coordinator at New Directions.  (Dunn Dep. Tr. at 5-6, 18, Donahoe Aff. Ex. 4, Docket No. 16.)  Dunn's role is to discuss treatment goals with employers like DM&E who use New Directions' services, to refer employees to counseling services when appropriate, and then to stay in contact with both the employer and the employee's counselor.  (*Id*. at 9-10.)  Dunn completed an initial evaluation of Buzzard.  (*Id*. at 20-21.)  Dunn then referred Buzzard to Diane Caspers, a substance abuse professional ("SAP") at Lutheran Social Services.  (*Id*. at 21-22.)

In January 2007, Buzzard began meeting with Caspers.  (Dunn Dep. Tr. at 22, Donahoe Aff. Ex. 4, Docket No. 16.)  Caspers' role was to "ensure treatment compliance."  (Caspers Dep. Tr. at 15, Donahoe Aff. Ex. 5, Docket No. 17.)  At a meeting on January 8, 2007, Caspers and Buzzard created an "EAP Agreement."  (Lund Aff. ¶ 5, Docket No. 18.)  The EAP Agreement stated that Buzzard would participate in a Family Focus intake interview.  (EAP Agreement, Lund Aff. Ex. D, Docket No. 18.)  Buzzard had told Caspers about this part of the terms of the stay of his civil commitment proceedings.  (Buzzard Dep. Tr. at 71, Donahoe Aff. Ex. 11, Docket No. 25.)  The EAP Agreement also stated that Buzzard was to contact Caspers weekly and "attend and demonstrate compliance with the recommended plan prior to [his] returning to work." (EAP Agreement, Lund Aff. Ex. D, Docket No. 18.)  His compliance with the plan would

be "determined by [the] EAP." (*Id*.) Buzzard was to "attend all scheduled appointments with [Caspers]," submit to return-to-work drug and alcohol tests, and "remain drug and/or alcohol free." (*Id*.) The EAP stated that Buzzard could return to work subject to the condition that DM&E could conduct random drug and alcohol testing. (*Id*.) In signing the agreement, Buzzard understood that he was bound by the conditions of the EAP. (Buzzard Dep. Tr. at 82, Donahoe Aff. Ex. 11, Docket No. 25.)

On January 14, 2007, Buzzard signed a return-to-work agreement, which "implement[ed] the EAP Agreement." (Lund Aff. ¶ 6, Docket No. 18.) The return to work agreement stated that Buzzard would be "reinstated to service on a leniency basis with [his] seniority unimpaired upon successful completion" of several conditions. (Return-to-Work Agreement, Lund Aff. Ex. E, Docket No. 18.) Buzzard agreed to submit to a return-to-work alcohol and drug test, to complete the Family Focus evaluation, to attend all counseling and after-care sessions, and to be subject to random alcohol screenings. (*Id*.) Buzzard understood that he would be subject to termination if he violated any of these conditions. (Buzzard Dep. Tr. at 82-83, Donahoe Aff. Ex. 11, Docket No. 25.)

On January 14, 2007, Buzzard returned to work at DM&E, but after three days he relapsed. (Buzzard Dep at 82-83, Donahoe Aff. Ex. 11, Docket No. 25.) On January 16, Urness visited Buzzard at his home to make sure he was still signed up for his Family Focus intake interview. (*Id*. at 87-88.) She discovered that Buzzard had been drinking and referred him to the Fountain Center in Albert Lea, Minnesota, where he began inpatient treatment. (*Id*. at 83, 86.) Buzzard notified Lund and Srp that he was entering

treatment.  (*Id*. at 84.)  Although Buzzard's use of alcohol had violated his EAP and return-to-work agreements, DM&E provided Buzzard with short-term disability benefits and did not terminate him.  (Lund Aff. ¶ 8, Docket No. 18.)  DM&E told Buzzard to contact it when he finished his treatment.  (Buzzard Dep. Tr. at 84, Donahoe Aff. Ex. 11, Docket No. 25.)

On January 19, 2007, Lund called Dunn to tell him that Buzzard had entered inpatient treatment and that she wanted Dunn to keep his file open for re-referral to Caspers after his release.  (Dunn's Contact Notes for Buzzard, Donahoe Aff. Ex. 6, Docket No. 17; Dunn Dep. Tr. at 27-28, Donahoe Aff. Ex. 4, Docket No. 16.)  Dunn testified that he passed along this information to Caspers that same day.  (Dunn's Contact Notes for Buzzard, Donahoe Aff. Ex. 6, Docket No. 17; Dunn Dep. Tr. at 28, Donahoe Aff. Ex. 4, Docket No. 16.)  On January 26, Dunn left a message for Caspers asking for an update on Buzzard's treatment, and on January 29, she replied that she had not had any contact with Buzzard.  (Dunn Dep. Tr. at 28, 30, Donahoe Aff. Ex. 4, Docket No. 16.)  Dunn testified that Caspers did not indicate to him that she felt her role in Buzzard's treatment was over.  (*Id*. at 30.)

On February 9, 2007, Buzzard finished his inpatient treatment at the Fountain Center.  (Buzzard Dep. Tr. at 88, Donahoe Aff. Ex. 11, Docket No. 25.)  He believed at this time that the EAP was no longer in effect because he had been treated at the Fountain Center.  (*Id*. at 120.)  He believed that the return-to-work agreement also no longer applied because "the circumstances" had changed.  (*Id*. at 151.)  Lund did not tell Buzzard at this time that the return-to-work agreement no longer applied.  (*Id*.)  Dunn

testified that on February 7, Buzzard called him to ask what information Caspers would need to continue treatment of Buzzard after his discharge. (Dunn Dep. Tr. at 32-33, Donahoe Aff. Ex. 4, Docket No. 16.)

Buzzard testified that he contacted Caspers soon after leaving the Fountain Center and that she told him "something to the effect . . . that she no longer needed to be dealt with, that [he] was to talk to either Roger Dunn or Traci Lund." (Buzzard Dep. Tr. at 91, Donahoe Aff. Ex. 11, Docket No. 25.) On February 12, 2007, Buzzard spoke by telephone with Lund and asked her how to return to work. (*Id*. at 90.) He also told her what Caspers had told him. (*Id*. at 91-94.) Lund told Buzzard that she would contact him with more information. (*Id*. at 90.) Buzzard also called Srp that day to tell him that he had completed treatment and was available for work. (*Id*. at 91.)

Dunn testified that on February 14, 2007, Caspers told him that she would be willing to continue to work with Buzzard, and that she gave no indication that she felt her role in Buzzard's treatment was over. (Dunn Dep. Tr. at 38-39, Donahoe Aff. Ex. 4, Docket No. 16.) On February 21, Caspers forwarded Dunn a Fountain Center discharge summary, which included treatment recommendations for Buzzard. (*Id*. at 38.) Dunn understood at the time that Caspers would monitor Buzzard's compliance with the Fountain Center's recommendations. (*Id*. at 41.)

Caspers' account of the events differs somewhat from both Buzzard's and Dunn's. She testified in her deposition that she had no record of speaking or meeting with Buzzard during his treatment at the Fountain Center or between February 9, 2007, and April 10, 2007. (Caspers Dep. Tr. at 25, 38, Donahoe Aff. Ex. 5, Docket No. 17.) She

testified that she closed Buzzard's file on January 25 after she learned that he had entered inpatient treatment. (*Id*. at 33-34.) At that time, she felt her "role was finished." (*Id*. at 33.) Caspers spoke with Lund on February 12 when Lund called to ask about discharge recommendations for Buzzard. (*Id*. at 22.) Caspers testified that she did not inform Lund at that time that she believed her role as an EAP provider was over, but in her deposition said that she "think[s] [she] indicated that [she] was puzzled" about why Lund was contacting her. (*Id*. at 45.)

On February 13, 2007, Buzzard was arrested for drunk driving and sent to a detox facility in Rochester, Minnesota. (Buzzard Dep. Tr. at 96-97, Donahoe Aff. Ex. 11, Docket No. 25.) He was unable to contact DM&E to notify the company that he was in a detox facility and he testified that he was unsure whether his wife contacted DM&E on his behalf. (*Id*. at 97.) On February 16, Buzzard was transferred to St. Peter Hospital for inpatient treatment. (*Id*.) He had access to a telephone sometime between February 19 and 23, but he testified that he could not recall whether he called anyone at DM&E during that period. (*Id*. at 98, 119.) After leaving the hospital, Buzzard entered a halfway house called the House of Hope. (*Id*. at 99.) He testified that he believes he entered the House of Hope on March 7, 2007. (*Id*.) He testified that he could not remember whether he notified anyone at DM&E that he was going to the halfway house. (*Id*.) Buzzard left the House of Hope in late March 2007. (Interrog. Ans. No. 4, Donahoe Aff. Ex. 1, Docket No. 16.)

On March 7, 2007, Lund learned from Dunn that Buzzard had had no contact with the EAP provider or the SAP. (Lund Aff. ¶ 9, Docket No. 18.) Dunn was unaware that

Buzzard had entered treatment again. (Dunn Dep. Tr. at 42, Donahoe Aff. Ex. 4, Docket No. 16.) On March 13, Buzzard contacted Lund and Lund told him that in order for him to return to work, she needed written confirmation that he was attending counseling sessions. (Lund Aff. ¶ 10, Docket No. 18.) On March 15, Dunn contacted Caspers, at which time he learned that she had not had contact with Buzzard. (Dunn Dep. Tr. at 42-43, Donahoe Aff. Ex. 4, Docket No. 16.) Caspers again did not tell Dunn that she had closed Buzzard's file. (*Id*. at 43.) On March 20, Dunn left a voicemail for Buzzard. (*Id*. at 43.) On March 23, Dunn contacted Lund again to tell her that Buzzard had not been in contact with his counselor. (Lund Aff. ¶ 11, Docket No. 18.) Because Buzzard's failure to contact Caspers violated the return-to-work agreement, DM&E terminated Buzzard's employment. (*Id*.)

On January 16, 2008, Buzzard filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶ 6, Docket No. 1.) The charge was cross-filed with the Minnesota Department of Human Rights ("MDHR"). (*Id*.) On July 29, 2008, the EEOC issued Buzzard a right to sue letter. (*Id*. ¶ 8.) On August 13, 2008, Buzzard received correspondence from the MDHR informing him that he had 90 days to pursue a civil action on his state law claims. (*Id*. ¶ 9.)

On October 23, 2008, Buzzard filed suit against DM&E, alleging that DM&E violated the ADA and Minnesota Statute § 363A.03 by discriminating against Buzzard based on his disability. (Compl., Docket No. 1.) DM&E filed a motion for summary judgment, arguing that there are no genuine issues of fact regarding whether DM&E violated the ADA or the Minnesota Human Rights Act. (Docket No. 13.)

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II. BUZZARD HAS FAILED TO MEET HIS BURDEN IN RESPONDING TO DM&E'S MOTION FOR SUMMARY JUDGMENT.

Buzzard alleges that DM&E terminated his employment because of his disability of alcoholism, in violation of both the ADA and the Minnesota Human Rights Act. Minnesota courts interpret the Minnesota Human Rights Act using the same framework and analysis that applies to violations of the ADA, and therefore the Court limits its discussion to the ADA. *See Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 (8th Cir. 2007) (noting that it is appropriate to analyze claims under both statutes using the same framework).

Employment discrimination claims under the ADA are evaluated using the *McDonnell Douglas* burden-shifting analysis, where the employee has the burden of making a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To establish a prima facie case of employment discrimination under the ADA, the employee must show (1) that he was a disabled person within the meaning of the ADA, (2) that he was qualified to perform the essential functions of his job, and (3) that he suffered an adverse employment action because of his disability. *Finan v. Good Earth Tools, Inc.*, 565 F.3d 1076, 1079 (8th Cir. 2009). The parties do not dispute that Buzzard was qualified to perform the essential functions of his job.

If the employee successfully establishes a prima facie case of discrimination, the burden then shifts to the employer, who must give a valid, non-discriminatory reason for its actions. If the employer does so, the burden then shifts back to the employee, who must demonstrate that the reason proffered is pretext for unlawful discrimination. *Kozisek v. County of Seward, Neb.*, 539 F.3d 930, 935 (8th Cir. 2008).

### A. Buzzard Is Not Disabled Within the Meaning of the ADA.

The ADA defines "disability" as: "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; . . . a record of such an impairment; . . . or being regarded as having such an impairment." 42 U.S.C. § 12102(1). The Court addresses only the first and third definitions, as Buzzard does not claim to have a "record" of impairment. Buzzard has not established that there

is a genuine fact issue regarding whether his alcoholism is an actual disability or whether DM&E regarded it as a disability.

### 1. Buzzard's Alcoholism Does Not Substantially Limit One or More of His Major Life Activities.

For an individual's impairment to meet the ADA's definition of a disability, that individual must be "[u]nable to perform a major life activity that the average person in the general population can perform," or must be "[s]ignificantly restricted as to the condition, manner or duration" in which the individual can perform a major life activity. 29 C.F.R. § 1630.2(j)(1). Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id*. § 1630.2(i). Courts consider the following factors to determine whether an impairment rises to the level of a disability under the ADA: "(i) The nature and severity of the impairment; . . . (ii) The duration or expected duration of the impairment; . . . and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id*. § 1630.2 (j)(2).

Buzzard argues that the "limitations" he suffers during his relapses of alcoholism show inability to perform major life activities such that a jury could find that he has an actual disability under the ADA. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 7, Docket No. 21.) He describes the impairment caused by his alcoholism as restriction in "his ability to care for himself, including feeding himself and regular hygiene." (*Id*.)

No reasonable juror could conclude that Buzzard's relapses restrict his diet and hygiene habits so severely that his ability to care for himself is significantly below that of

the average person. Buzzard's self-described eating and hygiene habits during his relapses are not uncommon among non-disabled persons in the general population. Moreover, Buzzard's diet and hygiene deteriorate only during his relapses. Thus, by Buzzard's own admission, any restrictions in his level of self-care during his relapses are temporary and do not demonstrate that his alcoholism has a "permanent or long term impact" on his ability to perform major life activities as required under the ADA standard. *See Burch v. Coca Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) (stating that "temporary afflictions," including "the effects of . . . alcoholism-induced inebriation," do not qualify as disabilities and that the plaintiff had not demonstrated "any substantially limiting impairment of any significant duration"); *see also Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997) ("Statutory disability requires permanent or long-term limitations.").

### 2. DM&E Did Not Regard Buzzard as Having a Disability.

An individual without any actual disability may still be able to establish a prima facie case of discrimination under the ADA if the employer regards the individual as having a disability. 42 U.S.C. § 12102(3). This provision "is intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006) (internal quotation marks omitted). "A person is regarded as disabled if (1) the employer mistakenly believes that the employee has an impairment (which would substantially limit one or more major life

the average person. Buzzard's self-described eating and hygiene habits during his relapses are not uncommon among non-disabled persons in the general population. Moreover, Buzzard's diet and hygiene deteriorate only during his relapses. Thus, by Buzzard's own admission, any restrictions in his level of self-care during his relapses are temporary and do not demonstrate that his alcoholism has a "permanent or long term impact" on his ability to perform major life activities as required under the ADA standard. *See Burch v. Coca Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) (stating that "temporary afflictions," including "the effects of . . . alcoholism-induced inebriation," do not qualify as disabilities and that the plaintiff had not demonstrated "any substantially limiting impairment of any significant duration"); *see also Heintzelman v. Runyon*, 120 F.3d 143, 145 (8th Cir. 1997) ("Statutory disability requires permanent or long-term limitations.").

### 2. DM&E Did Not Regard Buzzard as Having a Disability.

An individual without any actual disability may still be able to establish a prima facie case of discrimination under the ADA if the employer regards the individual as having a disability. 42 U.S.C. § 12102(3). This provision "is intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that work to the disadvantage of persons with or regarded as having disabilities." *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006) (internal quotation marks omitted). "A person is regarded as disabled if (1) the employer mistakenly believes that the employee has an impairment (which would substantially limit one or more major life

activity), or (2) the employer mistakenly believes that an *actual* impairment substantially limits one or more major life activity." *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 988-89 (8th Cir. 2007) (internal quotation marks omitted). In the context of the major life activity of work, the employer must "mistakenly believe that the actual impairment substantially limits the employee's ability to work." *Id*. at 989. However, "[i]f a restriction [in the work context] is based upon the recommendations of a physician, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability." *Breitkreutz*, 450 F.3d at 784.

Buzzard argues that DM&E's alleged requirement that he participate in the EAP is sufficient evidence for a jury to "find that [DM&E] took the actions it did against [Buzzard] because it regarded him as being disabled." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 7-8, Docket No. 21.) Buzzard relies on *Miners v. Cargill Communications, Inc.*, in which the Eighth Circuit found that an employer had mistakenly perceived an employee as an alcoholic. The employee produced evidence that the employer knew that the employee had missed a day of work because of her drinking the night before and that the employer forced the employee to choose between entering an alcohol treatment program and being fired. 113 F.3d 820, 823 (8th Cir. 1997). The court concluded that this evidence showed that the employer regarded the employee as disabled under the ADA. *Id*. at 822.

Buzzard's situation is more similar to that of the employee in *Kozisek*, in which the Eighth Circuit held that the employer had not violated the ADA by firing the employee, Kozisek, for failing to complete an alcohol treatment program. *Kozisek*,

539 F.3d at 936. The court distinguished *Miners*, noting that counselors at two facilities had recommended that Kozisek be treated for alcoholism. *Id*. at 933. Kozisek had also attended AA meetings, *id*. at 936, and had been arrested for crimes he committed while intoxicated, *id*. at 933. The court found that these facts showed that the employer did not base its view of Kozisek as an alcoholic or its "restriction" requiring him to complete an alcohol treatment program before returning to work on "misconceptions, myths or stereotypes." *Id*. at 935. Thus, the employer did not regard Kozisek as disabled under the ADA. *Id*. at 936. Similarly, Buzzard had been diagnosed with alcoholism and had attended AA meetings. He openly admitted to DM&E that he is an alcoholic and that he had relapsed. Even if the Court were to construe DM&E's referral of Buzzard to New Horizons as mandatory, the referral was based on actual evidence that Buzzard was an alcoholic. No reasonable juror could find that DM&E met the ADA definition of regarding Buzzard as disabled.

### B. Buzzard did not suffer an adverse employment action because of a disability.

Even if the Court found that Buzzard was disabled within the meaning of the ADA, to establish a prima facie case of discrimination, he must also demonstrate that he suffered an adverse employment action because of his disability. *Finan*, 565 F.3d at 1079. Termination is an adverse employment action. *See Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008). However, Buzzard has failed to adduce evidence from which a reasonable jury could conclude that DM&E terminated his employment because he is an alcoholic.

Buzzard argues that DM&E's requirement that he follow the EAP rather than simply allowing him to return to work is "discriminatory on the basis of [Buzzard]'s alcoholism." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 2, Docket No. 21.) Buzzard claims that the requirement is discriminatory because DM&E would not have made a mandatory referral to the EAP "[h]ad [he] been hospitalized for any other reason other than alcohol use." (*Id*. at 8.)

Terminating an employee who violates a voluntary[2] return-to-work agreement is not an adverse employment action because of a disability under the ADA. *See Longen v. Waterous Co.*, 347 F.3d 685, 689 (8th Cir. 2003). These agreements are not discriminatory, especially when they are "supported by valuable consideration – i.e., that [the employee will] not be terminated." *Id*. Buzzard's return-to-work agreement was supported by valuable consideration, because it guaranteed that he would keep his position at DM&E as long as he met the conditions of the agreement.

Buzzard's argument ignores the facts. First, Buzzard benefited from the agreement. He continued to receive benefits while he was in treatment, even after violating the EAP by drinking. DM&E held Buzzard's position open for him during that period. Second, DM&E did not create the EAP; Buzzard and Caspers did. Third,

---

[2] Any factual dispute as to whether the referral to New Horizons was mandatory is not material. Lund characterized the referral as mandatory in the return-to-work agreement that she sent to Buzzard on January 13, 2007. (Return-to-Work Agreement, Lund Aff. Ex. E, Docket No. 18.) At that time, however, Buzzard had already voluntarily agreed to the EAP referral. (EAP Agreement, Lund Aff. Ex. C, Docket No. 18.) At the time he agreed to the EAP referral, he understood then that EAP referral was normal DM&E protocol, and that he was experiencing an alcohol use problem. (Buzzard Dep. Tr. at 72-73, Donahoe Aff. Ex. 11, Docket No. 25.) Because there is no genuine dispute that Buzzard voluntarily agreed to the EAP, Lund's subsequent characterization of the New Horizons referral as mandatory is not material.

Buzzard does not dispute that he agreed to the condition requiring that he comply with the EAP in order to return to work. Last, Buzzard suggested that the EAP require Buzzard to complete the Family Focus program because that requirement was a condition imposed through the civil commitment proceeding – neither Caspers nor DM&E suggested that condition.[3]

Buzzard argues that *Miners* supports his claim that his termination was discriminatory. (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 9, Docket No. 21.) In *Miners*, the court found that the employer regarded the employee as an alcoholic, a finding that "create[d] an inference that her termination was motivated by unlawful discrimination." 113 F.3d at 824. The employee had never admitted to being an alcoholic, and had never voluntarily agreed to seek treatment for alcoholism. *Id*. at 822. By contrast, Buzzard has failed to show evidence by which a reasonable jury could conclude that DM&E regarded him as an alcoholic. Moreover, he admits to being an alcoholic, and he voluntarily entered into the EAP.

Because there is no genuine issue of material fact that Buzzard is not disabled as defined by the ADA, and that even if Buzzard were disabled, that DM&E did not terminate him because of his disability, Buzzard has failed to establish a prima facie case of discrimination. Therefore, the Court does not reach the next step in the burden-

---

[3] Buzzard's argument that the Voluntary Referral Policy discriminates against alcoholics ignores federal regulations that recommend that railroad carriers make substance abuse treatment programs available to employees who are responsible for safety-sensitive functions, and that require railroad carriers to identify employees with substance abuse problems and help them seek treatment. 49 U.S.C. § 20140; 49 C.F.R. § 219.401(b). The ADA recognizes that railroad carriers may require that employees comply with Department of Transportation regulations "that apply to employment in sensitive positions in such an industry." 42 U.S.C. § 12114(c)(5)(C).

shifting analysis. *See Kozisek*, 539 F.3d at 935. The Court grants defendant's motion for summary judgment.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Dakota, Minnesota & Eastern Railroad Corporation's Motion for Summary Judgment [Docket No. 13] is **GRANTED**. Plaintiff's complaint [Docket No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: August 26, 2010　　　　　　　　　　　　　　s/ John R. Tunheim
at Minneapolis, Minnesota.　　　　　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge